1
2
3
4
5
6
7

**KALCHEIM LAW GROUP, P.C.**
Mitch Kalcheim (SBN: 175846)
mitch@kallawgroup.com
Amber S. Healy (SBN: 232730)
amberh@kallawgroup.com
9300 Wilshire Blvd., Suite 508
Beverly Hills, CA 90212
Telephone:     310-461-1210
Facsimile:     310-461-1212

Attorneys for Plaintiff

8
9

### UNITED STATES DISTRICT COURT

### CENTRAL DISTRICT OF CALIFORNIA

10
11
12
13
14
15
16
17
18
19
20
21

| | |
|---|---|
| JAMES "JIM" BROWN,<br><br>        Plaintiff,<br><br>v.<br><br>ELECTRONIC ARTS, INC., a<br>Delaware Corporation; and DOES 1-50;<br><br>        Defendants. | Case No.: CV09-01598 FMC (RZx)<br><br>**PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>DATE:  OCTOBER 5, 2009<br>TIME:   10:00 A.M.<br>COURTROOM.:  750<br><br>Action Filed: March 6, 2009<br>Trial Date: Not Set<br><br>ASSIGNED TO THE HONORABLE FLORENCE-MARIE COOPER |

22
23
24
25
26
27
28

---

OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

# TABLE OF CONTENTS

**Page**

I.  PRELIMINARY STATEMENT…………….……………………...................1

II. PROCEDURAL HISTORY AND STATEMENT OF

      REVELANT FACTS………………………………………………..…2

    A. Procedural History…………………………………………………2

    B.  Statement of Relevant Facts ……………………………………….2

III.    LEGAL ARGUMENT……………………………………………4

    A. Standard of Review ………………………………………………...4

    B.  The Statute of Limitations Does Not Bar This Action………......6

        i.  The discovery rule applies…………..…………………....6

        ii.  Equitable tolling applies to all of Plaintiff's claims………...6

        iii.  The single publication rule does not apply………………….7

    C. Plaintiff states a cause of action for each count of the complaint…7

        i.  Plaintiff's Statutory Misappropriation Cause of

            Action……………………………………………………7

            a.  The §3344(d) Public Affairs Exception Does Not

               Apply To Defendant's Madden NFL Video

               Game………………………………………………....11

        ii.  Plaintiff's Common Law Right of Publicity……………...12

            a.  Plaintiff Can Establish That Defendant Uses Plaintiff's

               Identity In the Madden NFL Video Game...................12

            b.  The Question of Whether Defendant Used Plaintiff's

               Identity Is A Question Of Fact For The Jury………...14

        iii.  Plaintiff's Lanham Act Claim………………………………14

            a.  The *Downing* Factors Favor Plaintiff………………...15

i

iv.  California Business and Professional Code……………..…17

D. The First Amendment is Unavailable As A Defense……...……...18

   i.  Defendant's Use of Plaintiff's Identity and Likeness

    Was Not Transformative..........................................................18

      a.  Plaintiff's Likeness Is Not One Of The Raw Materials

       From Which Defendant's Video Game Is Synthesized

       But Is Instead Part Of The Sum And Substance

       Of The Video Game…………   ….……………………19

      b.  Any Artistic Contribution By Defendant Via The Video

       Game Is Subordinate To The Appropriation Of

       Plaintiff's Likeness…………………………………..……21

IV.    CONCLUSION…………………………………………………22

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

I:\Active Civil Library\EA\LIT\Opp To MTD 20090831.Doc

# **TABLE OF AUTHORITIES**

**Page**

<u>**Cases**</u>

<u>Abrego v. Dow Chem. Co.</u>, 443 F.3d 676, 681 (9th Cir. 2006)……………………..5

<u>AMF, Inc. v. Sleekcraft Boats</u>, 599 F.2d 341, 348-49 (9th Cir. 1979)…………..…15

<u>Branch v. Tunnell,</u> 14 F.3d 449, 454 (9th Cir. 1994) ………………………………..5

<u>C.B.C. Distrib. & Mktg. v. MLB Advanced Media</u>. 505 F.3d 818 (8th Cir. 2007)..12

<u>Cel-Tech Communications, Inc. v. Los Angeles Cellular Phone Co.</u>,

20 Cal. 4th 163, 180 (1999)  ………………………………………………………18

<u>Church of Scientology of Cal. v. Dell Publishing Co., Inc.</u>,

367 F.Supp. 767 (N.D. Cal. 1973)……………………………………………...7

<u>Comedy III v. Saderup,</u>  25 Cal. 4th 387, 410 (2001)………………..8-9, 1-12, 18-21

<u>Doe v. TCI Cablevision</u>, 110 S. W.3d 363, 369 (Mo. 2003)………………..……12

<u>Dora</u>, 15 Cal. App. 4th 536 (1993)……………………………………………11

<u>Downing v. Abercrombie & Fitch</u>,

265 F.3d 994, 1007 (9th Cir. 2001)………………………….....................11, 14-17

<u>Eastwood v. Superior Court</u>, 146 Cal. App. 3d 409, 417 (1983)…..………....…12

<u>Garcia v. Brockway</u>, 526 F.3d 456, 465 (9th Cir. 2008)……………………….6

<u>Gionfriddo v. Major League Baseball</u>, 94 Cal. App. 4th 400 (2001) ……………...11

<u>Goto.com v. Walt Disney Co.</u>, 202 F.3d 1199, 1209 (9th Cir. 2000) …………..…..6

Hewlett v. Squaw Valley Ski Corp., 54 Cal. App. 4th 499 (Cal. App. Ct. 1997)....17

Kanarek v. Bugliosi, 108 Cal. App. 3d 327, 166 Cal. Rptr. 526 (1980).............7

Kirby v. Sega of America, Inc.,

141 Cal. App. 4th 47, 53 (Cal. Ct. App. 2006)...........................20-21

Leong v. Potter, 347 F.3d 1117, 1123 (9th Cir. 2003)........................6

Midler v. Ford Motor Co., 849 F.2d 460, 463 (9th Cir. 1988).................8

Montana v. San Jose Mercury, 34 Cal. App. 4th 790 (1995)................11

Motschenbacher v. R.J. Reynolds Tobacco Co.,

498 F.2d 821 (9th Cir. 1974) .........................................13-14

Parrino v. FHP, 146 F.3d 699, 705-06 (9th Cir. 1998) ......................5

Parrish v. NFL Players Ass'n., 534 F.Supp.2d 1081, 1089 (N.D. Cal. 2007)......6

The Romantics v. Activision Publg., 574 F. Supp. 2d 758 (E.D. Mich. 2008).......21

Santa Maria v. Pacific Bell, 202 F.3d 1170, 1178 (9th Cir. 2000) ............6

State Farm Fire & Casualty Co. v. Superior Court,

45 Cal. App. 4th 1093, 1103 (Cal. App. Ct. 1996)..........................18

White v. Samsung Electronics,

971 F.2d 1395, 1397 (9th Cir. 1992)...............8-12, 13-14, 16-17

Winter v. DC Comics.  Winter v. DC Comics,

30 Cal. 4th 881 (2003)...........................................18-21

Zacchini v. Scripps-Howard 433 U.S. 562, 575 (1977) ....................18

iv

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**Page**

**<u>Statutes</u>**

15 U.S.C. § 1125(a)…………………………………………………………...………15

California Business & Professional Code § 17200…………………………….....17

California Civil Code § 3425.3 (2009)……………………….………...……….7

California Civil Code § 3344……………………………………..……….…7, 8, 11-12

Lanham Act § 43(a) ……………………………………………….....14-15, 18, 20

**<u>Rules</u>**

Federal Rule of Civil Procedure 12(b)(6)……………………………………….4, 5

Federal Rule of Civil Procedure 12(d)……………………………………………….5

Federal Rule of Civil Procedure 56……………………………………………….5, 8

I:\Active Civil Library\EA\LIT\Opp To MTD 20090831.Doc

# I. <u>PRELIMINARY STATEMENT</u>

Defendant, Electronic Arts, Inc. (hereinafter "EA") created, marketed, sold and made significant money on its Madden NFL video games using Plaintiff Jim Brown's likeness and  identity as a player for the 1965 Cleveland Browns and as part of the All-Time Great Cleveland Brown teams.  The creators of the Madden NFL video games set out and succeeded in using male football players, including Jim Brown's, physical stature, statistical ability, race and national origin as the main components of the game.  They depicted the players' uniforms, helmet styles, numbers and the skin color of each NFL player in their Madden NFL video games.  Defendant continued their likeness of Plaintiff and the NFL players by creating players that had superior skills in their football position as compared to other players in the same video game. For example, if one player was a great running back, such as Plaintiff Jim Brown, the Defendant's video game would have that same player rated in a certain manner and/or included on an all-time team factually distinguishing the player from the other players in the game. The Defendant, in the Madden NFL video games that are the subject of this action, could have used images of women, children, animals or fictional characters playing football – such as a bear playing an eagle.  Defendant chose not to. Instead, Defendants consciously choose to use the likeness and identity of Plaintiff Jim Brown and other actual NFL player in its video game.

Not presented by Defendant EA in its moving papers is the admission by Jake Schatz, VP Legal of EA, in an email dated September 10, 2007 that "Jim Brown has not appeared in any Madden NFL game since 1998."  The Defendant intentionally withheld the September 10, 2007 admission from the Court.  For the same reason that the admission defeats the application on all grounds, Defendant also failed to disclose to the Court that it has paid compensation to current and former NFL players for the use of their likeness in the Madden NFL video games.  The Plaintiff has not been paid any compensation of any kind.   This action seeks compensation for the use of his likeness "in the game".

1

OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

## II. <u>PROCEDURAL HISTORY AND STATEMENT OF RELEVANT FACTS</u>

### A. <u>Procedural History</u>.

The attempt to characterize the Plaintiff's claims as having twice failed is a material misrepresentation to this Court and an example of overzealous legal posturing.  At no time, in any jurisdiction, has the plaintiff's claims been addressed either procedurally or substantively by any Court.  The attempt to so characterize the procedural history colors each of the arguments and demonstrates the lack of merit in the motion.

Plaintiff initially filed his claims against EA and others in the State of New York.  That complaint was voluntarily dismissed, without prejudice.  The Plaintiff timely filed a substantially identical complaint in the within Court in March 2009.  As a matter of right, the complaint was timely amended in July, 2009.  The subject motions were filed on August 8, 2009.  This Court's rulings will be the first and only ruling by any Court on any claim between these parties.

### B. <u>Statement of Relevant Facts</u>.

Without filing an answer, conducting any discovery or presenting expert testimony to the Court so that a ruling can be made upon review of a full factual record, Defendant seeks to have the pleading dismissed because Defendant claims that Mr. Brown is not "in the Game".   The facts do not support EA's position.

- On September 10, 2007, Jacob Schatz, Vice President of the legal department for EA Sports, wrote that "Jim Brown has not appeared in any Madden NFL game since 1998". This admission alone demonstrates that Plaintiff was "in the game".  See Declaration of Tim McIlwain ("McIlwain Declaration") at Exhibit E.

- The Defendant marketed and sold a version of the Madden NFL video game that had 'old school teams' and teams consisting of over 200 of the NFL's greatest players.  Plaintiff is widely recognized as one of those players.  See McIlwain Declaration at Exhibits C, D, and F.

- In the 2006 version of the game – which EA continues to market and sell - the Madden NFL game rosters stated that "Have you ever wanted to play or

2

look at the game in Madden 2006 with all the stars in the past playing with the stars of today?"  The material then lists specific names after Joe Montana, including Jim Brown, to be players "in the game".  The same version created a dream team and historic default rosters – listing plaintiff on the Cleveland Browns. See McIlwain Declaration at Exhibit G.

- On August 3, 2007, defendant EA Sports' Executive Vice President, Joel Linzner, sent a letter stating that Jim Brown's name and likeness does not appear in Madden 2008 or any packaging or marketing material associated with the product.  This representation again appears to be misleading since an internet search of video footage of Jim Brown produces, as the first listing, a YouTube video by EA Sports advertising Jim Brown's name associated with the product.  See McIlwain Declaration at Exhibit I.

- The marketing on Google for the 2009 team specifically reveals Jim Brown being used in their marketing as the second name listed with approximately 10 other widely recognized NFL players.  See McIlwain Declaration at Exhibit I.

- On October 18, 2008, at the University of Southern California School of Law Intellectual Property Seminar, Defendant's Director of Business Affairs, Ondraus Jenkins, and Vice President of Business Development, Michael Shaffer, stated that the Defendant was allowed to use the image and likeness of current and former NFL players because it obtained the written authorizations from both the players and the NFL.  See Declaration of Katrina Yu ("Yu Declaration").

- During this three-day seminar, representatives Shaffer and Jenkins stated that the right to use the image and likeness of NFL players was created by contract; not a right derived from the First Amendment.   See Yu Declaration.

- Plaintiff Jim Brown never provided his consent or signed away his likeness rights to the defendant EA Sports or any other organization.   See Paragraphs 17 through 19 of Amended Complaint.

In the moving papers, Defendant provided still photos of a Cleveland Browns running back from certain versions of the game.  The photos depict a player wearing both a dark and white Cleveland Browns jersey.  Plaintiff attaches still photos from actual footage from the YouTube promotion material of plaintiff Jim Brown wearing

3

OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

the same jerseys.  See McIlwain Declaration at Exhibit B.  The July 2009 YouTube images of Jim Brown are the same as the "player" in the still photos attached to the moving papers.

On August 1, 2008, in response to defendant EA Sports' position that Jim Brown was not used in the Madden NFL video game, a consumer of the game, stated:

> "Any reasonable person would reasonable infer that the player represented was Jim Brown.  To say otherwise is like calling the grass purple and hoping that you're talking to a blind man.  [Emphasis added]  We all know it was Jim Brown.  Jim Brown knows it was Jim Brown.  Any judge and jury will know it was Jim Brown".  … See McIlwain Declaration at Exhibit C.

Another consumer of the product stated the following:

> "… to think that the running back on the all browns team could be anyone but Jim Brown is an absolute joke.  Not even Johnnie Cochran could make that statement with a straight face!  And to close … the statement of the day is it's remarkable how hard those companies protect their IEP rights and, on the other hand, how easy they contest the notion of image rights, in order to violate the player's rights."  See McIlwain Declaration at Exhibit D.

On June 4, 2009, Chris Mortensen of ESPN reported that the 2,056 retired players won a jury verdict for the use of their images in videogames.  See McIlwain Declaration at Exhibit K.

## III. LEGAL ARGUMENT

### A. Standard of Review.

The standard of review is the same as a motion under Rule 56 for summary judgment.  We will not burden the Court with a detailed review of the summary judgment standard.  We note that all factual inferences must be in the favor of Plaintiff as the non-moving party and that the motion is procedurally premature since no discovery has been conducted.  Without a full record, the court is not in a position to determine the matter on the merits.

In the moving papers, Defendant EA has misconstrued the standard of review under Rule 12(b)(6).  Defendant attached to its motion multiple exhibits that examine

4

OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

the copies of *Madden NFL* and the "screen grab" images  as well as providing the Court with copies of the games and the equipment necessary to view their content. (See Exh. A-I of Defendant's motion).  It is well-established that a court may consider documents "whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the [complaint]."  <u>Branch v. Tunnell</u>, 14 F.3d 449, 454 (9th Cir. 1994).  *See also* <u>Parrino v. FHP</u>, 146 F.3d 699, 705-06 (9th Cir. 1998), *superseded by statute on other grounds*; <u>Abrego v. Dow Chem. Co.</u>, 443 F.3d 676, 681 (9th Cir. 2006).  However, the standard of review changes to the Rule 56 standard of review when outside documents are considered by the court. FRCP 12(d). Clearly, the video game(s), screen grab images and game controller equipment are items presented to the court by Defendant and relied upon to support the application are outside of the pleading.

The 9th Circuit directs that "[W]here a defendant attaches extrinsic evidence to a Rule 12(b)(6) motion, the court ordinarily must convert that motion into one for summary judgment under Rule 56 to give the plaintiff an opportunity to respond." <u>Parrino v. FHP</u>, 146 F.3d 699, 706 n.4 (9th Cir. 1998). Nowhere in the complaint does Plaintiff refer specifically to the "screen grabs" attached as Exhibits I and J to Defendant's motion, as Plaintiff will not (and does not) limit his proof of likeness to a static frame of a video game that is designed to be active.  Specifically Exhibits A-H merely contain the covers to the cases that contain the various video games themselves; Plaintiff's claims do not rely on the designs exhibited on any of these covers.  Exhibits I and J depict "screen grabs" – football players from certain editions of the video game in static poses.   The static poses viewed in a vacuum, are insufficient to determine whether one's likeness has been misappropriated since the video game, like the actual game played in the NFL, is rarely, if ever, in a static position.  We submit that the court should convert Defendant's Rule 12(b)(6) motion into a Rule 56 motion for summary judgment and apply the standards under that Rule.

OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

1    **B.  <u>The Statute of Limitations does not bar this action.</u>**

2    **i.    The discovery rule applies.**

3    The Statute of Limitations must be examined from the date that the cause of

4    action accrues. This is a fact sensitive determination as to when Plaintiff knew or

5    should have know of facts which give rise to his claim. <u>Goto.com v. Walt Disney Co.</u>,

6    202 F.3d 1199, 1209 (9th Cir. 2000).  The earliest that the Defendant can assert that

7    Plaintiff knew or should have known that his likeness was used by Defendant "in the

8    game" was upon receipt of the September 10, 2007 letter admitting to his inclusion in

9    versions of the game prior to 1998.  See McIlwain Declaration at Exhibit E.  There is

10   no other factual reference in the record and thus the complaint was timely filed on

11   March 6, 2009 – within two (2) and four (4) years of the September 10, 2007

12   communication.

13   **ii.    Equitable tolling applies to all of Plaintiff's claims.**

14   Equitable tolling applies. "If a reasonable plaintiff would not have known of the

15   existence of a possible claim within the limitations period, then equitable tolling will

16   serve to extend the statute of limitations for filing suit until the plaintiff can gather

17   what information he needs." <u>Santa Maria v. Pacific Bell</u>, 202 F.3d 1170, 1178 (9[th]

18   Cir. 2000), *rev'd on other grounds*.  *See also* <u>Parrish v. NFL Players Ass'n</u>., 534

19   F.Supp.2d 1081, 1089 (N.D. Cal. 2007); <u>Leong v. Potter</u>, 347 F.3d 1117, 1123 (9th

20   Cir. 2003); <u>Garcia v. Brockway</u>, 526 F.3d 456, 465 (9th Cir. 2008).

21   Plaintiff is 73 years old. Plaintiff has never owned video games, any platforms

22   on which to play video games and does not know how to operate any video game

23   equipment.   See Amended Complaint.  It is unreasonable to assume that Plaintiff

24   knew or should have known that his likeness was being used in any of Defendant's

25   video games upon their release.  It would be inequitable to so find.

26

27

28

OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

### iii.     The single publication rule does not apply.

Defendant incorrectly asserts that the single publication rule applies to this action.  *See* Cal. Civ. Code § 3425.3 (2009).   The rule only applies to torts "founded upon any single publication or exhibition or utterance, such as any one issue of a newspaper or book or magazine or any one presentation to an audience or any one broadcast over radio or television or any one exhibition of a motion picture."  *Id.* Based on the rule itself, it bears no application to Plaintiff's claims.

The Defendant has not cited any case from any jurisdiction holding that video games fall under the single publication rule.  The release of each yearly edition of the game may best be compared to the reprinting of a hardcover book in a paperback edition.  In <u>Kanarek v. Bugliosi</u>, 108 Cal. App. 3d 327, 166 Cal. Rptr. 526 (1980), the court held that the reprinting the book *Helter Skelter* in paperback form was not subject to the single publication rule because "the single publication rule … does not include separate aggregate publications on different occasions. … In these cases the publication reaches a new group and the repetition justifies a new cause of action." *Id.* at 333 (citing R.2d of Torts § 577A).  *See* <u>Church of Scientology of Cal. v. Dell Publishing Co., Inc.</u>, 367 F.Supp. 767 (N.D. Cal. 1973). The single publication rule does not apply.

### C.     <u>Plaintiff states a cause of action for each count of the complaint.</u>

### i.     Plaintiff's Statutory Misappropriation Cause of Action.

Section 3344 prohibits the use of "another's name, voice, signature, photograph or likeness, in any manner," and explicitly prohibits such use "on or in products, merchandise, or goods or, for purposes of advertising or selling…" without prior consent. Cal. Civ. Code § 3344.    Plaintiff asserts that his likeliness is used in EA's Madden NFL games without his consent – a fact supported by Defendant's September 10, 2007 admission.  See McIlwain Declaration at Exhibit E.

Plaintiff states a prima facie cause of action under Section 3344 for misappropriation. Since the Defendant does not assert that Plaintiff has provided his

OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

consent or that the statute is invalid, the Defendant must argue that it has not used his likeness to avoid liability under section 3344.  There exists a factual dispute.[1] Defendant admits that Plaintiff was in the Madden NFL video games prior to 1998 but denies that the image of the "African-American" running back on the 1965 Cleveland Browns and All Browns teams is plaintiff.  The Defendant provides no explanation for this inconsistent position. The Plaintiff contents that since he was a 3-time league Most Valuable Player, a member of the NFL Hall-of-Fame, a member of the All-Madden Team-All Millennium Team, only played for the Cleveland Browns, was the only running back on the Cleveland Browns 1965 team that wore a number in the thirties and is widely and universally recognized as the best running back in both Cleveland Browns and NFL history, that the Cleveland Brown, muscular, all-time great African-American running back in the Madden NFL video game is his likeness. See McIlwain Declaration and attachments thereto.

The Courts interpreting this section have determined that the term "likeness" under the statute refers to a "visual image."  *See* Midler v. Ford Motor Co., 849 F.2d 460, 463 (9th Cir. 1988).  Expanding on the interpretation of "likeness," the Ninth Circuit Court noted that a "caricature or impressionistic *resemblance*" may also constitute a likeness under the statute.  White v. Samsung Electronics, 971 F.2d 1395, 1397 (9th Cir. 1992) (emphasis added). *See also*, *Midler*, 849 F.2d at 463.  In 2002, the California Supreme Court reached such a conclusion when finding that defendant's charcoal drawing of The Three Stooges and reproduction of such drawing on t-shirts constituted misappropriation of The Three Stooges' likeness in violation of the statute.[2]  Comedy III v. Saderup, 25 Cal. 4th 387, 410 (2001).  The Supreme Court further noted that the lithographs and t-shirts were themselves tangible goods

---

[1]     We submit that under the Rule 56 standard of review, that Plaintiff be given the permissible inference that his likeness was used in the EA Madden NFL video games.

[2]     In *Comedy III v. Saderup*, the California Supreme Court interpreted the statute as it applied to deceased celebrities but noted that the language originated in the portion of the statute applying to living individuals.  *Comedy III*, 25 Cal. 4th 387, 392 (2001).

8

OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

1  displaying "graphic art," which qualified as "products, merchandise or goods" within

2  the meaning of the statute.  *Id*. at 395.

3  　　　　Like *Comedy III*, Defendant uses a visual image that resembles Plaintiff and

4  reproduces such image as graphic art in copies of its product, the Madden NFL video

5  game.   Defendant acknowledges that it uses the visual image of an "African-

6  American" running back on both its 1965 Cleveland Browns and All Browns teams

7  and that Plaintiff was in their video games from 1998.   In accordance with the *White*

8  Court's interpretation of "likeness," the African-American running back on the

9  respective Browns teams resembles Plaintiff because the visual image features, *inter*

10  *alia*, Plaintiff's stature, appearance, movement, skin color, uniform, number and

11  ability.

12  　　　　Defendant would have the court believe that the visual image in the video game

13  is a "generic" image of an "African-American running back."   However, only three

14  players, including Plaintiff, could validly claim to be a running back on the 1965

15  Cleveland Browns team.   AC ¶¶ 22.   The universe is not therefore all "generic

16  African-Americans" as Defendant suggests but is instead limited to three individuals.

17  　　　　The evidence further supports a finding that the visual image portrayed in the

18  video game is Plaintiff, and not either of the two back-up running backs.  Plaintiff is a

19  Hall of Fame collegiate and professional football player.  AC ¶¶ 11.  Plaintiff received

20  the NFL's Most Valuable Player ("MVP") award three times, including 1965, when

21  the Cleveland Browns won the Super Bowl and became world champions in

22  professional football.  AC ¶¶ 8-12.  Further, John Madden, a well-known analyst and

23  former football player himself (for whom the Madden NFL video game is named),

24  selected Plaintiff to his All-Madden All-Millennium team, as one of the greatest

25  professional football players of the 20th century.   AC ¶¶ 8-12.   In 2002, a well-

26  respected publication in the sports industry, *Sporting News*, named Plaintiff as the

27  greatest football player in history.   AC ¶¶ 9.   Neither Ernie Green nor Leroy Kelly

28  earned or came close to earning such accolades.

9

OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

1    Defendant also used Plaintiff's name and likeness as late as 2009 in its

2 YouTube promotional material.  McIlwain Declaration at Exh. I.  In addition to the

3 aforementioned features of the visual image, the Cleveland Browns' African-

4 American running back in the Madden NFL video game dons Brown's number 32

5 jersey in some versions of the game and number 37 jersey in later versions of the

6 game.  AC ¶¶ 22(a).  Unlike Brown, both Green and Kelly wore jersey numbers in the

7 40's.  AC ¶¶ 22.

8    Defendant cites *White* to support its assertion that it did not use Plaintiff's

9 likeness.  In *White*, defendant utilized in an advertisement the image of a robot

10 wearing a long gown, blond wig, and large jewelry similar to plaintiff's appearance on

11 the game show, "Wheel of Fortune."  *White supra*, 971 F.2d at 1399.  Defendant's

12 purpose was not to depict Vanna White herself but to show in a futuristic world how

13 the Vanna White figure may appear on the game show.  *Id*. at 1396.  The Ninth Circuit

14 Appeals Court determined that the district court erred in granting summary judgment

15 for defendant on the right of publicity and Lanham Act claims.  *Id*. at 1397, 1399 and

16 1401.  The *White* Court explained that defendant "used a robot *with mechanical*

17 *features*, and not, for example a manikin" derived directly from White's features. *Id*.

18 at 1397 (emphasis added).

19    Unlike *White*, Defendant does not use a robot with mechanical features.

20 Defendant admits that its goal is to realistically portray the game of football, including

21 *inter alia*, stadiums, fans, weather conditions, lighting, commentary, uniforms,

22 coaches, and players.  Defendant's Motion to Dismiss at 4.  Defendant relied upon

23 Brown's likeness, including his skin color, physical size, uniform, number, stature,

24 appearance and ability to create the African-American running back featured on the

25 1965 Cleveland Browns and All Browns teams in its Madden NFL video game.  AC

26 ¶¶ 22.  Defendant aims to depict Jim Brown himself, the actual running back on the

27 1965 Cleveland Browns team as opposed to a Jim Brown "like" image.  Further,

28 Madden NFL's "high-definition graphics" allow a "real-time" portrayal of the figure's

OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

movements.   Defendant's Motion to Dismiss at 4-5.   Defendant's depiction of Plaintiff is therefore more akin to a manikin as distinguished by the *White* Court or the drawing in *Comedy III*, as opposed to the mechanical robot in *White*.   Defendant's reliance on *White* is misplaced.[3]

### a. The § 3344(d) Public Affairs Exception Does Not Apply To Defendant's Madden NFL Video Game.

The public affairs exemption under Cal. Civ. Code § 3344(d) does not apply. Courts have limited the scope of the "public affairs" exemption.   <u>Downing v. Abercrombie & Fitch</u> 265 F.3d 994, 1007 (9th Cir. 2001) stands for the proposition that even if the subject matter falls within the category of public affairs, the *form* of expression may not be protected by the First Amendment and may fall outside of the § 3344 public affairs exception.   *Id*. at 1002 (emphasis added).

The three cases that Defendant cites in support of its position that the Madden NFL video game qualifies for the § 3344(d) exception are all distinguishable from Defendant's video game – a newspaper featuring plaintiff's photograph (<u>Montana v. San Jose Mercury</u>, 34 Cal. App. 4th 790 (1995)); a surfing documentary (<u>Dora</u>, 15 Cal. App. 4th 536 (1993)); and baseball game programs providing commentary on the history of baseball  (<u>Gionfriddo v. Major League Baseball</u>, 94 Cal. App. 4th 400 (2001)).   Unlike EA's video game, the aforementioned are informative or newsworthy works conveying historical or newsworthy commentary.

In <u>Gionfriddo v. Major League Baseball</u>, the Court explicitly noted that the *Gionfriddo* case was "not a situation where [b]aseball affixed plaintiffs' names or images to merchandise such as T-shirts, lithograph prints, baseball souvenirs, or other tangible products in order to market them to the public." *Gionfriddo*, 94 Cal. App. 4th at 414 Unlike the baseball programs in *Gionfriddo*, Defendant's Madden NFL video game does not significantly contribute to informing the public of any newsworthy

---

[3]    The White Court did not decide for all purposes "when a caricature or impressionistic resemblance might become a likeness." *White*, 971 F.2d at 1397.

OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

matter regarding Plaintiff or the game of football.[4]   Defendant merely uses Plaintiff's likeness and identity in a tangible product, the Madden NFL video game, and marketed that product to the public.

Even if the § 3344 exception could apply as Defendant argues, the question of whether consent is required under the statute is a question of fact. *See Comedy III*, 25 Cal. 4th at 393.  Plaintiff has not provided his consent.  The motion to dismiss based on sub-section 3344(d) should not be granted.

### ii.    Plaintiff's Common Law Right of Publicity.

In California, the common law right of publicity requires a showing that (1) defendant used plaintiff's identity; (2) defendant's use of plaintiff's name or likeness was to defendant's advantage, commercially or otherwise; (3) lack of consent; and (4) resulting injury.  *See* Eastwood v. Superior Court, 146 Cal. App. 3d 409, 417 (1983).

### a.    Plaintiff Can Establish That Defendant Uses Plaintiff's Identity In the Madden NFL Video Game[5].

Defendant does not dispute that "the common law right of publicity reaches means of appropriation other than name or likeness."[6]  *White supra*, 971 F.2d at 1398. However, Defendant argues that there is no authority to support the notion that attributes such as "running ability," "physical stature," and "race" is protectable.  *Id*. Notably, there is also no authority to support Defendant's claim that such attributes are not protectable.

---

[4]      Since EA denies that Plaintiff is even in the game – how can the game serve to provide anything newsworthy regarding Plaintiff?

[5]      The discussion here will only focus on Plaintiff's ability to prove the first element – Defendant's use of Plaintiff's identity – since Defendant only directly challenged Plaintiff's ability to meet this element in the Motion to Dismiss.  Defendant's Motion to Dismiss at 10.

[6]      Defendant's reliance on the Eighth Circuit Court's holding in C.B.C.Distrib. & Mktg. v. MLB Advanced Media that use of names and statistics may not violate the right of publicity is misplaced here.  First,  the Eight Circuit Court interpreted the right of publicity under Missouri law, which limits a right of publicity action to "use of plaintiff's *name as a symbol of his identity*"  C.B.C. Distrib. & Mktg. v. MLB Advanced Media. 505 F.3d 818, -- (8th Cir. 2007) (quoting Doe v. TCI Cablevision, 110 S. W.3d 363, 369 (Mo. 2003) (emphasis added). Unlike defendant in *C.B.C.*, EA does not simply convey Plaintiff's name or mere statistics but uses Brown's likeness and identity in violation of California law.

12

OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

In fact, Courts have held the to the contrary, that use of certain features of a celebrity may violate the right of publicity, even where the celebrity's facial features are unrecognizable.  *See e.g.*, <u>Motschenbacher v. R.J. Reynolds Tobacco Co.</u>, 498 F.2d 821 (9th Cir. 1974).  In <u>Motschenbacher v. R.J. Reynolds Tobacco Co.</u>, plaintiff, a professional racecar driver claimed violation of his right of publicity when defendant featured plaintiff's racecar in a photograph.  *Id.* at 822.  The Ninth Circuit Court refused to decide the case on summary judgment despite the fact that (1) plaintiff himself was not visible in the commercial and (2) defendant changed the racing number on the car from plaintiff's number "11" to number "71".  *Id.*  Later, the *White* Court citing precedent including *Motschenbacher*, held that the District Court erred in granting summary judgment for defendant on the right of publicity claim.  *White supra*, 971 F.2d 1395, 1398-99 (9th Cir. 1992).  In *White,* the Court expressed that by performing certain actions, like turning the letters on a game-board on what appeared to be a "Wheel of Fortune" game show set left "little doubt" as to which celebrity the robot was meant to depict.  *Id.* at 1399.

> The Court even offered the following hypothetical to emphasize the point: Consider a hypothetical advertisement which depicts a mechanical robot with male features, an African-American complexion, and a bald head. The robot is wearing black hightop Air Jordan basketball sneakers, a red basketball uniform with black trim, baggy shorts, and the number 23 (though not revealing 'Bulls' or 'Jordan, lettering).  The ad depicts the robot dunking a basketball one-handed…Considered individually, the robot's physical attributes, its dress, and its stance tell us little.  Taken together, they lead to the only conclusion that any sports viewer…[would conclude that] the ad is about Michael Jordan.  *Id.* at 1399.

Like *Motschenbacher* and *White*, even if Plaintiff's facial features are not specifically identifiable and even if EA changes Browns' uniform number, the use of certain attributes in the aggregate leave little doubt that the featured running back in 1965 and All-Time Cleveland Browns teams is Jim Brown.   Similar to the mechanical robot with the African-American complexion and red basketball uniform in the *White* Court's hypothetical, Defendant uses more than uniform colors and Plaintiff's basic physical appearance to identify him.  The image in Defendant's video

13

OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

1    game has an African-American complexion and is *expressly* identified as a 1965

2    Cleveland Browns running back, wearing a Cleveland Browns uniform – the same

3    uniform style, number and helmet Plaintiff wore when he played on the 1965

4    Cleveland Browns team.  Defendant's Motion to Dismiss AC at 2 (emphasis added).

5            Further, the image engages in the game of football set on a football field in a

6    stadium.  *Id*. at 4-5.  Also, like the image in Defendant's video game, Plaintiff is the

7    only 1965 Cleveland Browns running back to wear a number in the 30's.  AC ¶¶ 22(a)

8    and (b).  In some versions of Defendant's video game, the Browns' running back even

9    wears Plaintiff's number 32 jersey – a number that no other player has worn for the

10   Cleveland Browns and that was retired after plaintiff ceased playing football.  *Id*.  As

11   in the hypothetical, when taken in the aggregate a sports viewer would likely conclude

12   that the running back on the 1965 and All Browns team is the league's three-time

13   MVP All-Time great, Hall of Famer and All-Madden Millennium Team member, Jim

14   Brown.  Plaintiff has clearly stated a claim upon which relief can be granted.

15
16
                    **b.      The Question of Whether Defendant Used Plaintiff's
                             Identity Is A Question Of Fact For The Jury.**

17           The Ninth Circuit Court in *Motschenbacher* held that although defendant did

18   not appropriate plaintiff's name or likeness because plaintiff himself was not visible,

19   the right of publicity claim should still reach the jury.  *Motschenbacher supra*, 498

20   F.2d at 827. Similarly, in *White*, the Court held that the robot, although it was not

21   molded after plaintiff's own figure, possessed sufficient characteristics for a jury to

22   find that defendant misappropriated her identity.  *White supra*, 971 F.2d at 1397-99.

23   The Plaintiff has stated a claim for misappropriation.

24           **iii.     Plaintiff's Lanham Act Claim.**

25           Courts allow celebrities to bring false endorsement and false advertising claims

26   under § 43(a) of the Lanham Act.  *See e.g.*, <u>Downing v. Abercrombie & Fitch,</u> 265

27   F.3d 994, 1007 (9th Cir. 2001).  Section 43(a) of the Lanham Act prohibits:

28           (1) Any person who on or in goods or services…uses in commerce any
             word, term, name, symbol or device or combination thereof, or any false

                                        14

OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

designation of origin, false or misleading description of fact, or false or misleading representation of fact, which---

(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services or commercial activities by another person. 15 U.S.C. § 1125(a).

In *Downing v. Abercrombie & Fitch*, the Ninth Circuit Court of Appeals stated that the likelihood of confusion standard is *predominantly factual* in nature. *Downing supra*, 265 F.3d 994, 1008 (9th Cir. 2001)(emphasis added). The Court went on to assert that "summary judgment is inappropriate when a jury could reasonably conclude that there is a likelihood of confusion." *Id*.

### a.      The *Downing* Factors Favor Plaintiff.

In its analysis, the *Downing* Court stipulated eight factors to evaluate when considering consumer confusion in false endorsement claims under § 43(a) of the Lanham Act. *Id*. at 1007-08 (citing the Ninth Circuit Court in *AMF, Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348-49 (9th Cir. 1979)). The *Downing* Court acknowledged that not all of the aforementioned factors may be present in any single successful case and that all the factors are not necessarily of equal importance. *Id*. at 1008.

The first *Downing* factor supports Plaintiff's claim since he is considered "legends in the [football] community and are still highly well-known and regarded." *Id*. It is undisputed that Jim Brown is one of the greatest professional football players of all time. Plaintiff is a Hall of Fame inductee and one of only four players to become NFL MVP in three different years. AC ¶¶ 8-16. John Madden, who licenses use of his name for Defendant's Madden NFL franchise, selected Plaintiff as one of the greatest football players of the 20th century. See McIlwain Declaration at Exh. L.

Like *Downing*, Plaintiff, among his other successes, is most well-known for his accomplishments as a football player. Defendant's unauthorized use occurs in a football video game licensed by the NFL, which simulates NFL games. Defendant's Motion to Dismiss at 4. The connection between Plaintiff and the Madden NFL video

15

OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

1   game is significantly stronger than the connection in *White*, and a jury could therefore
2   readily find that the second factor favors Plaintiff as well.

3          Regarding the third factor, similarity of the marks, the figure in Defendant's
4   video game has an African-American complexion, wears a Cleveland Browns
5   uniform, and in some versions of the video game wears Plaintiff's number 32 jersey.
6   Defendant's Motion to Dismiss at 2 and AC ¶¶ 22.  Actual **confusion** currently exists
7   since several consumers have stated that they understand that Plaintiff is "in the
8   game".  See McIlwain Declaration at  Exh. C and D.

9          The next *Downing* factor considers likely degree of purchaser care.  The current
10  YouTube video trailer of the Madden NFL video identifies Plaintiff as one of the
11  players "in the game". See McIlwain Declaration at Exh. B and I.   The evidence
12  shows that consumers are likely to expect and actually believe that the running back
13  on the respective Browns teams is Plaintiff.   See McIlwain Declaration at Exh. C and
14  D.    Additionally, Defendant failed to provide any notice or other indication to
15  consumers that Plaintiff was no longer a part of the video game.

16         The fifth factor refers to defendant's marketing channels.  In *White*, the Court
17  determined that the factor favored plaintiff because the robot in the commercial
18  appeared in front of a game-board in the same familiar "stance" as plaintiff often
19  appeared on the "Wheel of Fortune" game show.  *White*, 971 F.2d at 1401.  The Court
20  also considered the fact that defendant had explicitly featured the particular depiction
21  in numerous magazine advertisements.  *Id.* at 1400.  Similarly, the Court in *Downing*
22  determined that the catalogue featuring a photograph of plaintiffs was itself a
23  marketing channel.  *Downing supra*, 265 F.3d 994, 1008 (9th Cir. 2001).  Like *White*,
24  Plaintiff's image in the video game appears in the same familiar stance as Plaintiff
25  appeared on the football field.  Defendant's Motion to Dismiss at 5.  A video gamer
26  can then simulate "individual athlete's movements on the field" and engage in a "real-
27  time professional sports experience."  *Id*.  See McIlwain Declaration at Exh. F.  The
28  realistic nature of Madden NFL itself is a marketing channel utilized by EA to sell

OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

1    updated versions of its game each year.  Such depictions are likewise featured as a

2    part of EA's marketing scheme, "IT'S IN THE GAME."

3         The seventh factor considers the defendant's intent in utilizing Plaintiff's

4    likeness and whether defendant intended to profit from the confusion.  *See White*, 971

5    F.2d at 1400-01.  Defendant admits that Plaintiff is in versions of the game prior to

6    1998.  EA intentionally selected the 1965 Cleveland Browns as one of the greatest

7    teams in NFL history and as one of a few historic teams to appear in the more current

8    Madden NFL versions.  As MVP and the starting running back for the Cleveland

9    Browns during his era, Defendant intentionally selected Plaintiff to be the featured

10   running back in the game.  Defendant likewise selected Plaintiff for the All-Browns

11   team, a composite of the greatest Cleveland Browns players in history.  In addition,

12   Defendant pays for NFL, NFL team and NFL player licenses. Defendant's Motion to

13   Dismiss at 4.[7]  As a result, a consumer is likely to be confused regarding Plaintiff's

14   endorsement of the video game due to the authorized endorsement of Madden NFL by

15   the NFL, its member teams and other NFL players.  Accordingly, a jury could

16   determine that defendant intended to profit from the confusion.

17        In both *Downing* and *White*, the Court held that the eighth factor, expansion

18   into other product lines, was inapplicable to the case while still overturning summary

19   judgment in favor of plaintiff.  Since the factors collectively favor Plaintiff, Plaintiff

20   has stated a claim for which relief can be granted.

21        **iv.    California Business and Professional Code.**

22        California Bus. & Prof. Code § 17200 prohibits acts of unfair competition,

23   which include any "unlawful, unfair or fraudulent business practice."  Cal. Bus. &

24   Prof. Code § 17200.  California courts interpret the scope of unfair competition

25   broadly, as any practice forbidden by law, whether civil or criminal.  *See e.g.*, Hewlett

---

[7]    EA also pays a license fee to NFL Players, Inc., the licensing arm of the National Football
Players' Association ("NFLPA"), the exclusive labor union of NFL players, for rights to the names
and likenesses of current and retired players. Plaintiff never signed over such rights to either
Defendant or NFL Players, Inc. and has not been compensated for any use of his name and/or
likeness by Defendant.  AC ¶¶ 17, 18 and 26.   See McIlwain Declaration at Exh. M.

E:\Active Civil Library\EA\LIT\Opp To MTD 20090831.Doc

v. Squaw Valley Ski Corp., 54 Cal. App. 4th 499 (Cal. App. Ct. 1997).   Plaintiff's claim hereunder is not duplicative because § 17200 essentially "borrows" violations of other laws and treats them as unlawful practices that are *independently actionable*. *See e.g.*, Cel-Tech Communications, Inc. v. Los Angeles Cellular Phone Co., 20 Cal. 4th 163, 180 (1999) (citing the Appeals Court in State Farm Fire & Casualty Co. v. Superior Court, 45 Cal. App. 4th 1093, 1103 (Cal. App. Ct. 1996)) (emphasis added).

As discussed *supra*, Defendant engaged in unlawful business practices in violation of Cal. Civ. Code § 3344, the common law right of publicity and section 43(a) of the Lanham Act.  Any of the aforementioned violations would constitute a violation of § 17200.  The § 17200 claim will therefore stand upon a finding that Defendant has violated at least one of the other three causes of action.

**D.      THE FIRST AMENDMENT IS UNAVAILABLE AS A DEFENSE.**
      **i.      Defendant's Use of Plaintiff's Identity and Likeness Was Not Transformative.**

In *Zacchini v. Scripps-Howard*, the only U.S. Supreme Court case to directly address the right of publicity to date, the Supreme Court declared that, "[n]o social purpose is served by having defendant get free some aspect of the plaintiff that would have market value and for which he would normally pay."   Zacchini v. Scripps-Howard, 433 U.S. 562, 575 (1977).  The California Supreme Court has followed this principle in subsequent cases holding that depictions of celebrities amounting to little more than the appropriation of the celebrity's economic value are not protected expression under the First Amendment. *See Comedy III supra*, 25 Cal. 4th 387, 400-01 (2001).  Thus, a First Amendment defense will stand only if defendant's work is "transformative."  *Id.* at 404.

Citing its decision in *Comedy III*, the California Supreme Court articulated a test for determining whether a First Amendment defense will stand in *Winter v. DC Comics*.  *Winter v. DC Comics*, 30 Cal. 4th 881 (2003).   The test asks "whether the celebrity likeness is one of the raw materials from which the original work is

---

18

OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

synthesized, or whether the depiction or imitation of the celebrity is the very sum and substance of the work.  *Id.* at 888.   If defendant is unable to establish the former, the First Amendment defense will fail.

          **a.**    **Plaintiff's Likeness Is Not One Of The Raw Materials From Which Defendant's Video Game Is Synthesized But Is Instead Part Of The Sum And Substance Of The Video Game.**

The test for a trier of fact is to determine, from a complete record, "whether a celebrity's likeness is so transformed that it has become primarily the defendant's own expression rather than the celebrity's likeness." *Winter*, 30 Cal. 4th at 888. Expression as defined by the California Supreme Court means an expressive contribution beyond the depiction of a celebrity's likeness, regardless of whether the depiction is artistic. *Id.* Defendant's contribution to plaintiff's likeness must also involve more than a "trivial variation." *Id.* Thus, the inquiry is more quantitative than qualitative. *Comedy III*, 25 Cal. 4th at 407.  Accordingly, a depiction of a celebrity may still be subject to a right of publicity challenge even if the creator applies exceptional artistic skill. *Winter*, 30 Cal. 4th at 889.

In *Comedy III*, the California Supreme Court rejected defendant's First Amendment defense finding instead that defendant's charcoal drawing of The Three Stooges reproduced on lithographs and t-shirts for sale violated The Three Stooges' statutory right of publicity.  *Comedy III*, 25 Cal. 4th at 393.  The Supreme Court concluded that defendant's charcoal drawing amounted to little more than a reproduction of The Three Stooges' likenesses.  Defendant's artistic ability or skill was therefore irrelevant in determining whether defendant had contributed significant expression of his own.

By contrast, the California Supreme Court in *Winter v. DC Comics* found the comic book in question to include significant creative elements rendering plaintiff's likenesses sufficiently transformed.  *Winter*, 30 Cal. 4th at 890.   Plaintiffs, well-known performing and recording musicians, alleged unauthorized use of their

OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

1    likenesses in a comic book that portrayed them as half-worm, half-human.  *Id.* at 886

2    and 890.   In the comic book, the characters were also part of an "outlandish"

3    fictionalized story which described the half-worm, half-human creatures as born of the

4    rape of their mother by a supernatural worm creature that came from the ground.  *Id.*

5         In <u>Kirby v. Sega of America, Inc</u>., plaintiff, a pop singer, alleged that defendant,

6    a video game producer, misappropriated her likeness in violation of her right of

7    publicity and § 43(a) of the Lanham Act.   <u>Kirby v. Sega of America, Inc</u>., 141 Cal.

8    App. 4th 47, 53 (Cal. Ct. App. 2006).  Defendant cites *Kirby* for the proposition that

9    video games are per se protected expression.  Defendant's Special Motion to Strike at

10   2.   Defendant is misguided in this assumption.  The California Court of Appeals in

11   *Kirby* merely followed the California Supreme Court's analyses in *Comedy III* and

12   *Winter* and determined that the video game in question sufficiently transformed

13   plaintiff's potential likeness.  *Kirby*, 141 Cal. App. 4th at 60.  Analogizing the video

14   game in *Kirby* to the comic book in *Winter*, the Court reasoned that both works were

15   "fanciful" in nature.  *Id.* at 59.  Ultimately, the Court reached its holding by finding

16   more dissimilarities than similarities between plaintiff and the video game character

17   and setting.  *Id.*[8]

18        Like the charcoal drawing of The Three Stooges, Defendant merely reproduces

19   Plaintiff's likeness in a digital format.  Defendant's depiction is even more literal than

20   the charcoal drawing of The Three Stooges since the figure is in color and its

21   movements mimic those of plaintiff while playing football for the Cleveland Browns.

22   Declaration of Facts.  EA boasts that Madden NFL offers "high-definition graphics"

23   and a "real-time professional sports experience."  Defendant's Motion to Dismiss AC

24

---

25   [8]    The "Ulala" character was tall and slender unlike plaintiff.  *Kirby*, 141 Cal. App. 4th at 59.
     Ulala's typical hairstyle and primary costume also differed from those worn by plaintiff.  *Id.*
26   Moreover, the video game featured the character as a space-age reporter set in the 25th Century in
     outer space.  *Id.*  The Court observed that outer space had never been a backdrop of any of plaintiff's
27   music videos or photographs.  *Id.*  Finally, "Ulala's" dance moves were unlike any movements made
     by plaintiff in any of her music videos.  *Id.*  The Court therefore concluded that collectively, the
28   added expression was transformative.  *Id.*  In sum, the Court considered the video game character's
     stature, appearance, activity and movement and its similarity to those associated with plaintiff.

OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

at 4-5.  Therefore, unlike *Kirby* and *Winter*, Defendant adds no significant expression to the running back on the 1965 Cleveland Browns team.  Defendant creates no fanciful settings or storylines.[9]  Defendant merely recreates the activities of actual football games including the fans, weather conditions, lighting effects, stylized stadiums, coaches and players, not to mention the NFL trademarks and team uniforms that it licenses.  *Id*. at 4.

Moreover, unlike the video game in *Kirby*, Plaintiff's image in Madden NFL resembles his stature, appearance, activity and movement.  The running back in question is muscular with an African-American complexion.  *Id*. at 2.  He wears a Cleveland Browns uniform, just as Plaintiff did, and in several versions of the video game dons Plaintiff's number 32.  Defendant's Special Motion to Strike at 2 and AC ¶¶ 22(a).  Likewise, the running back can engage in football moves like a player on the field – running, dodging and scoring – simulating the very moves that garnered Plaintiff's success.  Defendant's Motion to Dismiss AC at 5.  Consequently, Defendant's video game renders a literal depiction of Plaintiff and does not add significant expression sufficient to render the video game transformative of Plaintiff's likeness.

### b.   Any Artistic Contribution By Defendant Via The Video Game Is Subordinate To The Appropriation Of Plaintiff's Likeness.

The California Supreme Court also indicated that in "close cases," a court may consider whether the marketability and economic value of the work derives primarily from the fame of the celebrity depicted.  *Comedy III*, 25 Cal. 4th at 407.  Even if this

---

[9]   Defendant cites *The Romantics v. Activision Publ.*, 574 F. Supp. 2d 758 (E.D. Mich. 2008), for the proposition that First Amendment protection is not limited to  complex storylines and scripts.  Defendant's Special Motion to Strike at 9.  *The Romantics* case is not controlling in California and begins from a different legal framework.  In *The Romantics*, plaintiffs, certain members of The Romantics band, challenged use of a song originally recorded by the band and featured in defendant's Guitar Hero video game.  Unlike California's recognized right of publicity in one's likeness and identity, Michigan has never recognized the right of publicity in one's voice.  Thus, the Court found that the Copyright Act preempted plaintiff's state law claim and reasoned that the First Amendment outweighed plaintiffs' right of publicity in the case.  It is not clear whether the Michigan court would have reached the same conclusion had plaintiffs challenged misappropriation of their name, identity or likeness.

21

OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

1   were a close case, which it is not, Defendant's First Amendment defense should fail
2   because the economic value of its Madden NFL video game derives primarily from its
3   use of NFL player likenesses, along with the NFL and team trademarks.   The
4   marketing theme mirrors this approach – "EA SPORTS IT'S IN THE GAME".

5       If this were not the case, Defendant could theoretically create a successful
6   football video game featuring a fictional league with fictional teams and players while
7   retaining as profits the hundreds of millions of dollars that it pays for the NFL and
8   player licenses. It does not.   Since any artistic skill applied is subordinate to the
9   economic value derived from use of Plaintiff's likeness, Defendant's First
10  Amendment defense should fail.

11  **IV.    <u>CONCLUSION</u>**

12      For the reasons set forth above, Plaintiff respectfully requests that the motion to
13  dismiss should be denied.

14

15

16  Dated: August 31, 2009              Respectfully submitted,
                                        Kalcheim Law Group, P.C.
17
                                        By: <u>/s/ Mitch Kalcheim              </u>
18                                          Mitch Kalcheim
19                                      Attorneys for Plaintiff:
20                                      James "Jim" Brown

21

22

23

24

25

26

27

28

OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

I:\Active Civil Library\EA\LIT\Opp To MTD 20090831.Doc

## CERTIFICATE OF SERVICE

I, Amber S. Healy, hereby certify that on August 31, 2009, I electronically filed the forgoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the Electronic Mail notice list, and I hereby certify that I have mailed the foregoing via the United States Postal Service to the non-CM/ECF participants indicated on the Manual Notice list.

I certify under penalty of perjury of the laws of the United States of America that the forgoing is true and correct.  Executed on August 31, 2009, at Beverly Hills, California.

_/s/ Amber S. Healy_____
Amber S. Healy